

NUMBER 13-19-00406-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF A.E.J. AND V.N.J., MINOR CHILDREN

**On appeal from the 430th District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes
Memorandum Opinion by Chief Justice Contreras**

This appeal concerns the trial court's order terminating the parental rights to minor children A.E.J. and V.N.J. The biological mother of the children, appellant E.J., contends by four issues that (1) her constitutional rights were violated, and (2–4) the evidence was legally and factually insufficient to support the trial court's findings. Court-appointed appellate counsel for the children's biological father, appellant J.B.J., has filed a brief stating he has identified no arguable grounds for appeal. We affirm.

## I. BACKGROUND

The two female children subject to these proceedings were born on June 30, 2012, and May 7, 2014. At a final hearing before an associate judge on July 13, 2018, J.B.J. testified that he was serving the first year of a twenty-two year prison sentence for causing injury to a child. He signed an affidavit voluntarily relinquishing his parental rights to A.E.J. and V.N.J. J.B.J. stated that the terms of the affidavit were read and explained to him; that all the facts in the affidavit were correct; that he understood the relinquishment was final and irrevocable; that he initialed and signed the affidavit freely and voluntarily; and that no one offered him anything or promised him anything in exchange for his signature. When asked by the children's attorney ad litem whether he felt "forced or pressured" to sign the affidavit because he was incarcerated, J.B.J. replied that he did not. J.B.J. further denied that the blood pressure, depression, and epilepsy medications he was then taking would prevent him from understanding what he was signing. A copy of the affidavit was entered into evidence.

After several continuances, the hearing resumed on February 1, 2019. J.B.J. testified that, in addition to the two children at issue in this case, he has an older daughter, M.J., with a different mother. When M.J. was five months old, J.B.J. and M.J.'s mother agreed that M.J. would live with her maternal grandparents. M.J. later came to live with appellants when she was five years old. M.J. was eleven years old at the time of trial.[1]

J.B.J. stated that appellee, the Department of Family and Protective Services (the Department), first became involved in his life when M.J.'s maternal grandparents reported him and E.J. for refusing to allow them to visit with M.J. Department investigators then

---

[1] J.B.J. agreed that his parental rights to M.J. were subject to termination in a separate proceeding.

interviewed appellants. During the course of the interview, appellants were asked about severe injuries M.J. had sustained to her buttocks. At the time, J.B.J. told investigators that the child "had fallen off the jeep"—but he acknowledged at the hearing that this was false and in fact he and E.J. "didn't know what happened" to cause M.J.'s injuries. He said he told E.J. "just agree with what I told you, go with the story that we had sent her out to—to get some toys from the van, you know, and that she had fallen off, you know, while she was trying to get off." He also told M.J. to repeat this "story." At the time appellants were interviewed by Department investigators, M.J. was being treated in the hospital, while A.E.J. and V.N.J. were staying with J.B.J.'s mother. Shortly thereafter, A.E.J. and V.N.J. were removed and placed in the custody of the Department.

J.B.J. testified that he first knew of M.J.'s injuries on the morning of July 10, 2017, when E.J. saw blood and pus stains on M.J.'s clothing. According to J.B.J., M.J. could not explain how she sustained the injuries, but she said that it hurt and she was "scared to death." Appellants applied antibiotic ointment and gauze and then took the child to the doctor; the doctor then told them to take M.J. to the hospital, and they did. J.B.J. acknowledged that M.J. also had a black eye when she was admitted to the hospital, but he denied that he or E.J. caused it—instead, he testified that M.J. told him she "hit herself" when she was playing with her sisters.[2] J.B.J. stated that he and E.J. sometimes spanked M.J. to discipline her, but they only used their hands, not objects.

J.B.J. denied causing the injuries to M.J.'s buttocks, but he conceded that he pleaded guilty to the criminal charge of causing injury to M.J. He stated that the District Attorney "pressured" him, so he "panicked" and agreed to plead guilty "[s]o they can leave

---

[2] Photographs of M.J.'s black eye were introduced into evidence.

me alone."[3] He stated that, even though M.J.'s injuries were so severe that she eventually needed a blood transfusion and skin grafts, M.J. "never said anything" and he and E.J. did not notice the injuries until July 10, 2017.[4]

On cross-examination by the attorney ad litem, J.B.J. agreed that he had told Department investigators that he and E.J. had actually known of M.J.'s injuries since July 3, 2017. He recanted his earlier testimony and admitted that, in fact, he and E.J. knew of the injuries on July 3, 2017. He stated E.J. had been "monitoring" the injuries and that they became worse on July 10, so they took M.J. to the doctor. When asked why they did not take M.J. to the hospital before then, J.B.J. replied: "I mean, we—we—we end up taking her, of course, yeah, afterwards, you know, cause, I mean, like I mentioned earlier, same reason, you know." He stated he was asking the court not to terminate his rights to A.E.J. and V.N.J.

Department investigator Felina Longoria testified that she made contact with M.J. after the child was admitted to Edinburg Children's Hospital on July 11, 2017. Longoria observed a bruise on M.J.'s right eye, bruises on her inner thigh area, and an infected, necrotic wound on her right buttock. She agreed that "the injuries were not consistent with the explanations that were being given" by appellants.

Longoria later visited appellants' home, where she observed that M.J.'s room had a mattress in it with "some type of drainage I believe from the injury that she had sustained." She filed for emergency removal of all three children due to "medical neglect"

---

[3] J.B.J. testified that, because of his epilepsy, "I panic right away and I start shaking and I don't know what to do. . . . [T]o get things out of the way I just say stupid things just to get left alone."

[4] Graphic photographs of the injuries, as they appeared when M.J. was admitted to the hospital, were entered into evidence. They depict large wounds, several inches in diameter, on each buttock. The left-side wound appears as a blister or burn, with skin missing. The right-side wound is larger and black in color, with a substantial amount of underlying dead tissue apparently missing.

4

and possible physical abuse of M.J., as well as the risk of physical abuse to A.E.J. and V.N.J. Two days after she spoke to M.J. in Edinburg, M.J. was transferred to University Hospital in San Antonio to receive additional treatment, and she remained hospitalized there for more than a month. Longoria stated that M.J.'s injuries were "life-threatening" and that the child received several skin grafts and wound cleanings during which "she had to be sedated because of . . . how much pain she was in."

According to Longoria, "not too long" before this incident, she investigated E.J. for possibly physically abusing M.J. Longoria testified that M.J. "initially stated that [E.J.] had burned her, then she recanted that outcry . . . ." The case was closed and there was no physical abuse finding made. A.E.J. and V.N.J. were interviewed by the Children's Advocacy Center and they appeared well fed, clean, and without any indications that they had suffered any physical abuse. However, according to Longoria, "[w]hen they were interviewed at the Children's Advocacy Center both children made outcries to either witnessing [E.J.] hitting [M.J.] with a stick on her butt or pushing her down the stairs, getting mad at [M.J.] for pooping on the floor . . . ."

Dora Gonzalez, the Department's caseworker, testified that, at an adversary hearing in August 2017, the court excused A.E.J. and V.N.J. from the courtroom because the children started crying when appellants walked in. She explained that both appellants have been incarcerated throughout the entire case. E.J. was convicted of causing injury to M.J. and was sentenced to two years in prison; at the time of trial, she had been released from prison but was in the custody of Immigration and Customs Enforcement.[5]

Gonzalez stated that A.E.J. and V.N.J. are currently placed in foster care in

---

[5] E.J. testified that she was in the process of being deported, but that there was an appeal pending.

Mission. The children refer to appellants by their first names, but they refer to their foster mother as "mom." Previously, the children had been living with E.J.'s cousin, but the cousin asked to have the children removed "because she was not able to handle the children's behaviors." In particular, A.E.J. would have "crying spells at night that could last up to five to six hours at a time," and V.N.J. "would mimic and do some of the same behaviors." A.E.J. was taken to a behavioral hospital twice—once by E.J.'s cousin and once by a prior foster parent—because of her crying spells. Although J.B.J. and E.J. provided names of other relatives, those relatives were either unable to care for the children or did not respond to the Department.[6] Gonzalez stated there were no other family placement options for A.E.J. and V.N.J.

Gonzalez testified she has been visiting the children at least once a month. Both girls are undergoing individual counseling with a therapist. According to Gonzalez, the children are "doing really well" in counseling and in their current placement. Both are behind in school but are progressing. A.E.J. and V.N.J. have also been able to visit with M.J. once a month. During one such visit, V.N.J. "ran up to [M.J.] and hugged her from the back and just told her 'I'm sorry for what [E.J.] did to you.'" At that point, M.J. "patted her butt and said 'I'm okay already, I'm okay," and then they hugged each other . . . ."[7] After the visits, however, the girls sometimes have recurring nightmares.

According to Gonzalez, E.J. sends letters and pictures to A.E.J. and V.N.J., and she contacts Gonzalez often to ask about the children. E.J. started parenting classes but

---

[6] E.J. provided the name of her brother as a potential caretaker; however, the Department determined it would be inappropriate to place the children with him because "he stated that he would not keep the girls away from [E.J.]." Additionally, E.J.'s brother would not agree to let the Department conduct periodic home studies.

[7] Gonzalez confirmed that M.J. has since recovered fully from her injuries, though she has scars.

6

was unable to complete them, or any other services, due to the fact that she was incarcerated. J.B.J. likewise has not successfully completed any services. When asked by the trial court why termination would be in the children's best interests, Gonzales replied: "At this time both parents are incarcerated, Your Honor, and we don't have any viable relatives willing and able to care for the children at this time and the children need a permanency, a stability and a safe home to be at."

E.J. testified that she filed for divorce from J.B.J. in 2018. She asked for custody of the children and for J.B.J. to have supervised visitation. Prior to being jailed, she worked as a telephone dispatcher and was the primary breadwinner for the family, with J.B.J. staying home and receiving disability benefits. She never formally adopted M.J., though she "considered getting rights signed over" at some point. Nevertheless, she enrolled M.J. in school and gave medical consent to doctors on her behalf. She took the children to and from school and doctor's appointments, since J.B.J. did not drive. E.J. stated that she and J.B.J. would both discipline the children, but E.J. denied ever physically spanking them or hitting them with any object.

E.J. denied knowing how M.J. suffered her injuries in July of 2017. She stated she first found out about the injuries on the morning of July 11, when she saw "a bloody type of tone" on M.J.'s blanket. She noticed that M.J. had a "serious infection" which was leaking fluid, decaying, and had a foul odor. According to E.J., M.J. was "calm" and did not complain or mention anything about the injury. When she asked J.B.J. about it, J.B.J. "didn't answer" and "was just telling me that he was going to get in trouble . . . ." E.J. denied that she discovered the injury prior to July 11, 2017.[8]

_____

[8] On cross-examination, E.J. conceded that she indicated to investigators on July 11, 2017, that she had known about the injuries for "a few days" prior and she had been treating them during that time;

7

E.J. testified that J.B.J. told her to lie to authorities because "he was worried that he was going to go jail." She claimed she went along with the story so that she could take the child to the doctor without argument from J.B.J.[9] E.J. claimed that she pleaded guilty to causing injury to a child "[b]ecause the attorney and the D.A. said that it would be best and the attorney told me that it wouldn't be held against me." According to E.J., her attorney never told her she would have a criminal conviction as a result of her guilty plea, and she would have "fought" the case if she had known that. She stated that the children did not have nightmares or crying spells when they were in her care prior to the Department's involvement. Once, M.J. told E.J. that she would want to live with her, rather than her father, if E.J. moved away. E.J. opined that it would be in the children's best interest for them to be placed with her mother, or her brother and his wife.

During E.J.'s testimony, J.B.J. asked to be excused from the proceedings. After admonishing J.B.J. on his right to confront witnesses, the trial court granted his request, and J.B.J. absented himself for the remainder of the day's testimony. However, he appeared with his attorney at subsequent settings on June 28 and July 17, 2019. At the June 28 setting, the children's guardian ad litem testified that A.E.J. and V.N.J. are currently in foster care in San Antonio and are "doing very well." She said the children "like where they're at" and "don't want to move." She recommended that appellants' parental rights be terminated because "the girls deserve a safe and loving home." The guardian ad litem conceded that she never spoke to E.J.

---

but she stated at trial that this was a "lie." She later agreed that her criminal conviction states that the crime was committed on July 4, 2017.

[9] The trial court asked E.J.: "Is it your testimony that the only way that [J.B.J.] is going to allow you to take the child to the doctor is if you agree to lie?" E.J. replied: "Yes, he was afraid he was going to go to jail and I had never understood why."

With respect to J.B.J., the associate judge made predicate findings under parts (D), (E), (L) and (Q) of family code § 161.001(b)(1), and he found that termination was in the children's best interests.[10] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (1)(E), (1)(L), (1)(Q), (2). With respect to E.J., the associate judge made predicate findings under parts (D) and (E) of that statute, and he found that termination was in the children's best interests. *See id.* § 161.001(b)(1)(D), (1)(E), (2). At a de novo hearing on August 21, 2019, the district judge took judicial notice of the trial record, adopted the associate judge's report, and rendered final judgment terminating appellants' parental rights and appointing the Department as each child's permanent managing conservator. *See id.* §§ 161.206(a), 201.014. This appeal followed.

## II. E.J.

### A. Violation of Constitutional Rights

By a multifarious first issue, E.J. argues that her constitutional rights to due process and due course of law were violated because "[t]here was information considered by the Court that was not entered into evidence." *See* U.S. CONST. amends. V, XIV; TEX. CONST. art. I, § 19.[11] Specifically, she contends that in reaching his judgment, the associate judge impermissibly considered (1) testimony from M.J.'s separate termination proceeding, and (2) his own personal experience.

The Department argues that E.J. failed to preserve these issues for review. We agree. During closing argument, the Department's counsel mentioned that M.J.'s injuries were so severe that they required a blood transfusion and skin grafts. E.J.'s counsel

---

[10] In pronouncing his findings, the associate judge stated that he would not "accept" J.B.J.'s irrevocable affidavit of relinquishment because "there has been some wavering with regard to this affidavit."

[11] Though the issue is multifarious, we choose to address it in our sole discretion.

9

objected, arguing that these facts were in evidence in M.J.'s termination case but not in the instant proceeding. The associate judge did not rule on the objection, but instead reminded the attorneys that testimony from the other case is not evidence in this case. Because there was no ruling on the objection, and because E.J.'s counsel did not object to the failure to rule, this sub-issue has not been preserved for appellate review. *See* TEX. R. APP. P. 33.1(a)(2). In any event, the record shows that J.B.J. testified in these proceedings, without objection, that M.J. was flown to San Antonio for skin grafts and a blood transfusion to treat her injuries.

The record further reflects that the associate judge made the following comment when pronouncing judgment:

> I look at the photo that was admitted in this case, and I cannot forget it. . . .
>
> You can't tell me that you found out about this on the day of. This child suffered immensely. Luckily, this child is healed and is recovering. These children were in that same home, seeing this child suffer and enduring trauma that you probably don't understand, and they didn't deserve that.
>
> I don't generally lecture about these cases, but this one bothers me a lot. I've actually had a surgery in that area and had tissue removed. I couldn't stand the pain for two weeks afterwards. I can't imagine the pain this child went through waiting to go to the doctor.

No party objected to the comment. *See* TEX. R. APP. P. 33.1(a)(1). Moreover, E.J. does not argue that the associate judge was biased or impartial, nor does she cite any authority establishing that her rights to due process or due course of law were violated. *See* TEX. R. APP. P. 38.1(i). This sub-issue has been neither preserved nor adequately briefed. Even it were, it would lack merit, because a judge sitting as a fact-finder is permitted to form his or her own opinion of the evidence based on the judge's experience and common knowledge. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). It is common knowledge that injuries of the type suffered by M.J. would cause extreme pain.

E.J. next argues by her first issue that the "seizure" of A.E.J. and V.N.J. was unreasonable under the United States and Texas Constitutions. *See* U.S. Const. amend. IV; Tex. Const. art. I, §§ 9. But "[o]nce a termination proceeding has progressed to a final hearing and the parental rights ordered terminated, the initial removal of the child from the parent is rendered moot." *In re J.D.S.*, 494 S.W.3d 387, 390 (Tex. App.—Waco 2015, no pet.); *see In re E.R.W.*, 528 S.W.3d 251, 257 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also In re D.R.M.*, No. 13-17-00320-CV, 2017 WL 6616738, at *2 (Tex. App.—Corpus Christi–Edinburg Dec. 28, 2017, no pet.) (mem. op.). Accordingly, any complaint concerning the initial removal of the children is moot.

E.J. also contends that "[t]he laundry list pleadings were so vague and non-specific that they basically amounted to no true notice at all as to what E.J. had done or what she was not doing." We disagree. The Department's petition alleged twenty different predicate grounds for termination under § 161.001(b)(1), including the grounds upon which E.J.'s termination order was based, parts (D) and (E). We have previously held that such an approach passes constitutional muster. *See In re D.R.M.*, 2017 WL 6616738, at *2.

Finally, E.J. contends by this issue that the Department failed to make reasonable efforts to return the children to her or to place the children with relatives. She cites *In re M.V.G.*, 440 S.W.3d 54, 59 (Tex. App.—Waco 2010, no pet.), in which the Waco court of appeals held that there was sufficient evidence to support a finding under § 161.001(b)(1)(N)(i) that the Department "made reasonable efforts to return the child to the parent." Part (N) of § 161.001(b)(1) is not one of the predicate grounds for termination found with respect to E.J. in this case; accordingly, *M.V.G.* is inapplicable. In any event, the evidence shows that the Department made reasonable efforts to return the children

with their parents, though those efforts were fruitless due to appellants' incarceration, which in turn was due to appellants' individual decisions to plead guilty to criminal charges arising from M.J.'s injuries. The evidence also shows that the Department made reasonable efforts to place the children with relatives of appellants, but that none were suitable.

E.J.'s first issue is overruled.

## B. Sufficiency of the Evidence

By her second and third issues, E.J. contends the evidence was legally and factually insufficient to support the trial court's findings under parts (D) and (E) of family code § 161.001(b)(1), respectively. By her fourth issue, she contends the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interests.

### 1. Applicable Law and Standard of Review

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982);

*In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). This intermediate standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

In reviewing the legal sufficiency of the evidence supporting termination, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005); *In re L.J.N.*, 329 S.W.3d at 671. We must assume that the fact finder resolved disputed facts in favor of its finding if it was reasonable to do so, and we must disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

When reviewing the factual sufficiency of the evidence supporting termination, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting this review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire

13

record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code § 161.001(b)(1); and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

### 2. Endangerment

Under part (D) of § 161.001(b)(1), the Department was required to show by clear and convincing evidence that E.J. knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Under part (E), the Department had to show by clear and convincing evidence that E.J. engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being. *Id.* § 161.001(b)(1)(E). "Endanger" means "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* Danger to a child need not be established as an independent proposition and may be inferred from parental misconduct. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or

emotional well-being. *Id.*

Evidence in this case established that, while in appellants' sole care, M.J. sustained serious, painful injuries which necessitated a lengthy hospital stay. J.B.J. testified that both he and E.J. knew of the injuries at least one week prior to taking M.J. to the doctor. J.B.J. also stated that both he and E.J. would discipline the children by hitting them with their hands. Longoria testified that, when A.E.J. and V.N.J. were interviewed by the Children's Advocacy Center, they reported that E.J. hit M.J. "with a stick on her butt" or "push[ed] her down the stairs." Additionally, M.J. made an outcry, which she later recanted, that E.J. had burned her. Gonzalez testified that, when V.N.J. visited with M.J., she apologized to M.J. "for what [E.J.] did to you." Both appellants admitted to lying to investigators about the cause of M.J.'s injuries, and they both pleaded guilty to felony offenses for causing the injuries. Although J.B.J. was the primary caregiver to the children while E.J. worked, E.J. was the only caregiver who could take the children to the doctor, because J.B.J. did not drive.

This case concerns only appellants' parental rights to A.E.J. and V.N.J., and the evidence in this case does not show that those children in particular suffered any physical injury due to E.J.'s conduct or neglect. However, such a showing is not necessary to support endangerment findings with respect to A.E.J. and V.N.J. *In re M.J.M.L.*, 31 S.W.3d 347, 350 (Tex. App.—San Antonio 2000, pet. denied) ("[E]ndangerment must be a direct result of a parental course of conduct, the conduct described does not have to be specifically directed at the child; nor does it have to cause an actual injury to the child or even constitute a concrete threat of injury to the child."); *see Dir. of Dallas Cty. Child Protective Servs. Unit of Tex. Dep't of Human Servs. v. Bowling*, 833 S.W.2d 730, 733

(Tex. App.—Dallas 1992, no writ) (noting that endangerment findings may be based on "violent or negligent conduct directed at the other parent or other children even where the behavior was not committed in the child's presence"). Instead, the statute is satisfied by showing that parental conduct simply "jeopardized" the children's physical or emotional well-being. *M.J.M.L.*, 31 S.W.3d at 350.

From the evidence set forth above, a reasonable trier of fact could have formed a firm belief or conviction that E.J. (1) knowingly placed or knowingly allowed A.E.J. and V.N.J. to remain in conditions or surroundings which endangered their physical or emotional well-being, and (2) engaged in conduct or knowingly placed A.E.J. and V.N.J. with persons who engaged in conduct which endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (b)(1)(E); *In re J.L.*, 163 S.W.3d at 85; *In re L.J.N.*, 329 S.W.3d at 671. Moreover, in light of the entire record, the contrary evidence was not so significant as to preclude the trial court from making such findings. *See In re J.F.C.*, 96 S.W.3d at 266. We therefore conclude that the evidence was legally and factually sufficient to support findings as to E.J. under parts (D) and (E) of § 161.001(b)(1). E.J.'s second and third issues are overruled.

### 3.    Best Interests

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131; *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Factors that we consider in determining whether termination of parental rights is in the child's best interest include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking

custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking termination is not required to prove all nine *Holley* factors; in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 25, 27. Evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in a child's best interest. *Id.* at 28.

As to the first *Holley* factor, the guardian ad litem testified that A.E.J. and V.N.J. are "doing very well" in their current foster placement in San Antonio and that they "don't want to move." As to the second and third factors, testimony established that the children are prone to crying spells and nightmares, and that they require ongoing therapy.[12] As to the fifth factor, E.J. has not completed any programs required of her by the Department's service plan, though this was due mainly to the fact that she was incarcerated. Finally, the evidence discussed above regarding the injuries sustained by M.J. while in appellants' sole care is relevant to the fourth and eighth *Holley* factors. On the other hand, there was uncontroverted testimony that E.J. regularly sends letters and pictures to A.E.J. and V.N.J. and contacts the guardian ad litem to ask about them. Moreover, E.J. appears to have been gainfully employed before being jailed for the abuse of M.J.

Overall, considering E.J.'s guilty plea to causing M.J.'s serious injuries, and in light

---

[12] E.J. testified that the children did not have nightmares or crying spells when they were in her custody, but she did not dispute that they do now.

17

of the children's heightened emotional and physical needs and the need for stability, we conclude that the trial court could have formed a firm belief or conviction that termination of E.J.'s parental rights was in the best interests of A.E.J. and V.N.J. Further, the contrary evidence was not so significant as to preclude such a finding. E.J.'s fourth issue is overruled.

### III. J.B.J.

#### A. *Anders* Brief

J.B.J.'s court-appointed appellate counsel has filed a brief stating that he has diligently reviewed the entire record and has concluded that there are no non-frivolous grounds for appeal. *See Anders v. California*, 386 U.S. 738 (1967); *Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 56 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.) ("[W]hen appointed counsel represents an indigent client in a parental termination appeal and concludes that there are no non-frivolous issues for appeal, counsel may file an *Anders*-type brief."). Counsel's brief meets the requirements of *Anders* as it presents a professional evaluation showing why there are no arguable grounds for advancing an appeal. *See In re Schulman*, 252 S.W.3d 403, 407 n.9 (Tex. Crim. App. 2008) (orig. proceeding) ("In Texas, an *Anders* brief need not specifically advance 'arguable' points of error if counsel finds none, but it must provide record references to the facts and procedural history and set out pertinent legal authorities."). Counsel has informed this Court in writing that he has: (1) notified J.B.J. that he has filed an *Anders* brief and a motion to withdraw; (2) provided J.B.J. with copies of both pleadings; (3) informed J.B.J. of his rights to file a pro se response,[13] to review the record

---

[13] In the criminal context, the Texas Court of Criminal Appeals has held that "the pro se response need not comply with the rules of appellate procedure in order to be considered. Rather, the response

preparatory to filing that response, and to seek review if we conclude that the appeal is frivolous; and (4) supplied J.B.J. with a form motion for pro se access to the appellate record. *See Anders*, 386 U.S. at 744; *Kelly*, 436 S.W.3d at 319–20.

On December 30, 2019, J.B.J. filed a pro se motion for access to the appellate record. We granted the motion and ordered the trial court to: (1) ensure that J.B.J. has the opportunity to fully examine the appellate record on or before January 15, 2020; and (2) notify this Court as to the date upon which the appellate record was made available to J.B.J. We further ordered appellant to file any pro se response within ten days of the date the record is made available to him. The trial court subsequently notified this Court that J.B.J. was provided with full access to the appellate record on January 13, 2020. More than an adequate time has elapsed since then, and J.B.J. has not filed a pro se response.

## B.    Independent Review

Upon receiving an *Anders* brief, we must conduct a full examination of all the proceedings to determine whether the appeal is wholly frivolous. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *see also In re G.M.*, No. 13-08-00569-CV, 2009 WL 2547493, at *1 (Tex. App.—Corpus Christi–Edinburg Aug. 20, 2009, no pet.) (mem. op.). We have reviewed the record and counsel's brief and we have found no reversible error with respect to J.B.J. *See Bledsoe v. State*, 178 S.W.3d 824, 827–28 (Tex. Crim. App. 2005) ("Due to the nature of *Anders* briefs, by indicating in the opinion it considered the issues raised in the brief and reviewed the record for reversible error but found none, the court of appeals met the requirements of Texas Rule of Appellate Procedure 47.1."). We have

---

should identify for the court those issues which the indigent appellant believes the court should consider in deciding whether the case presents any meritorious issues." *In re Schulman*, 252 S.W.3d 403, 409 n.23 (Tex. Crim. App. 2008).

19

specifically reviewed the trial court's findings as to J.B.J. under parts (D) and (E) of family code § 161.001(b)(1), and we have found no non-frivolous issues that could be raised on appeal with respect to those findings. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (holding that "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code").

## C.     Motion to Withdraw

J.B.J.'s counsel has filed a motion to withdraw. *See Anders*, 386 U.S. at 744; *see also In re Schulman*, 252 S.W.3d at 408 n.17 ("If an attorney believes the appeal is frivolous, he must withdraw from representing the appellant."). However, when an *Anders* brief is filed in a parental termination appeal, the appellant's right to appointed counsel extends to "all proceedings in [the Texas Supreme Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (citing TEX. FAM. CODE ANN. § 107.013(a)(1)). Thus, in the absence of additional grounds for withdrawal, a motion to withdraw brought in the court of appeals may be premature. *Id.* Counsel is permitted to withdraw only for good cause, and counsel's belief that the client has no grounds to seek further review from the court of appeals' decision does not constitute good cause. *Id.*

J.B.J.'s counsel's motion to withdraw does not show "good cause" other than counsel's determination that an appeal would be frivolous. Accordingly, in light of the Texas Supreme Court's decision in *P.M.*, we deny counsel's motion to withdraw. *See id.*; *see also In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pets. denied) (denying a motion for withdrawal in light of *P.M.* where it did not show "good cause" other than counsel's determination that an appeal would be frivolous); *In re A.M.*, 495 S.W.3d

20

573, 582 & n.2 (Tex. App.—Houston [1st Dist.] 2016, pets. denied) (noting that since *P.M.* was handed down, "most courts of appeals affirming parental termination orders after receiving *Anders* briefs have denied the attorney's motion to withdraw").[14]

## IV. CONCLUSION

The trial court's judgment is affirmed as to both appellants.

DORI CONTRERAS
Chief Justice

Delivered and filed the
13th day of February, 2020.

---

[14] The Texas Supreme Court has noted that, in cases such as this, "appointed counsel's obligations [in the supreme court] can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *In re P.M.*, 520 S.W.3d 24, 28 (Tex. 2016).